AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)          Approved: s/Daniel D. Gridley, Jr. 6-26-26

# UNITED STATES DISTRICT COURT
### for the
### Western District of Oklahoma

**FILED**

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )
INFORMATION ASSOCIATED WITH APPLE ID,              )    Case No.  M-26- 323  -CMS
LUKELADAY@ICLOUD.COM,  THAT IS STORED              )
AT PREMISES CONTROLLED BY APPLE INC.               )

2:09 pm, Jun 26, 2026
JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA
By: AC, Deputy Clerk

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the          **Northern**          District of          **California**          , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2113(b) | Bank Larceny |
| 18 U.S.C. § 371 | Conspiracy to Commit Bank Larceny |

The application is based on these facts:

See attached Affidavit of ATF Special Agent, Sam Spencer, which is incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sam Spencer, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     June 26, 2026

_____
*Judge's signature*

City and state:   Oklahoma City, Oklahoma

CHRIS M. STEPHENS, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE APPLE ID **LUKELADAY@ICLOUD.COM** THAT IS STORED AT PREMISES CONTROLLED BY APPLE INC. | Case No.  M-26-323    -CMS <br><br> **FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Sam Spencer, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with an account stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Attachment B.

2.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and empowered by law to conduct investigations of, and to make arrests for offenses as set forth in 18 U.S.C. § 2516.

3.      I am a Special Agent with the FBI, Department of Justice, and have been so employed since August 2023. I am currently assigned to the FBI Oklahoma City Division's Violent Crime Squad, where I have been involved in a wide variety of investigative matters, including numerous investigations targeting large criminal enterprises and gangs, the distribution of illegal drugs, and targeted ATM burglaries.  As part of my investigative experiences with the FBI, I have executed search and arrest warrants, conducted physical surveillance, coordinated controlled purchases of drugs with confidential sources, analyzed cellular phone records, and spoken with informants and subjects, as well as other local and federal law enforcement officers, related to criminal gang activity, illegal drug and weapons trafficking, and Hobbs Act burglaries.

4.      As part of my investigative experience, I have drafted and executed numerous search and arrest warrants, conducted physical surveillance, conducted controlled purchases of narcotics, utilized confidential sources, analyzed physical and digital records, and coordinated with local and federal law enforcement officers regarding the manner in which criminal organizations perpetuate their criminal activities. Through my training and experience, I have become familiar with the manner in which criminal organizations operate, and I am familiar with potential sources of evidence to that regard.

5.     The facts set forth in this Affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties.  Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 18, United States Code, § 2113(b) (Bank Larceny) and § 371 (Conspiracy to Commit Bank Larceny) exits in the **SUBJECT ACCOUNT**. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8.     In October 2025, the Oklahoma City FBI and the Oklahoma City Police Department ("OKCPD") launched a joint investigation into a series of ATM[1] burglaries

---

[1]     Automated Teller Machines, or ATMs, are typically located on the property of a bank. Most ATMs are bank property, while contracted companies manage the electronic security, maintenance, and cash dispensed by the ATM.

3

and burglary attempts that occurred in Oklahoma City, Moore, and Mustang, Oklahoma – located in the Western District of Oklahoma; and Atoka, Oklahoma – located in the Eastern District of Oklahoma. These ATM burglaries had a similar modus operandi which tended to indicate that they may have been committed by the same or related groups of individuals. In each of the incidents, a truck was stolen before the incident. That truck was then used with a heavy chain and hooks to attempt to gain access to cash cartridges within the ATM. In each incident, the perpetrators were disguised with similar attire, including gloves and face coverings. The perpetrators would back the stolen truck up to the ATM and perpetrators would quickly pry open the cover of the ATM before attaching tow hooks and chain to the interior of the ATM and the rear of the stolen truck. The perpetrators would then attempt to accelerate the vehicle in an effort to access the cash cartridges within the ATM. The stolen vehicle was discarded at the conclusion of each day's theft event(s) near the final ATM. Each incident occurred in the early morning hours. Surveillance video displayed the crew to operate in a rapid manner demonstrating preplanning and teamwork.

**II.    The August 22, 2025 Larceny Attempt and Successful Larceny**

9.     The initial ATM larceny attempt occurred on August 22, 2025, at Focus Federal Credit Union ("FFCU"), 14173 North MacArthur Boulevard, Oklahoma City, Oklahoma. The attempt was made at 4:34 a.m. using a stolen GMC Sierra pickup bearing Oklahoma license plate PPX426 ("Sierra"). Law enforcement obtained surveillance footage from FFCU, which depicts the gray Sierra arrive in front of the ATM on FFCU's property, where three unknown males exit the Sierra and approach the ATM, while the

driver stays in the truck. Two of the individuals are holding pry bars, and a set of chains and hooks can be seen draped over the tailgate of the Sierra, which the third individual waits next to. All four of the individuals are dressed in black clothing, gloves, and face coverings, leaving only their eyes visible to the surveillance cameras.

10. Based on the surveillance footage, a total of five individuals were observed at the ATM. After the first three crew members opened the front of the ATM, one individual set the tow hooks in the ATM, which were chained to the tow hitch of the Sierra. Once the hooks were set, the driver drove the Sierra forward, pulling the ATM from an upright position and onto the ground. Then, the three individuals waved the driver over to the ATM, and he arrived with a fifth individual. Collectively, the group lifted the ATM back to an upright position and exited the surveillance camera's field of view, unsuccessful in their attempt to take cash from the machine.

11. On the same morning at approximately 5:12 a.m., an ATM at First Fidelity Bank – Moore ("FFB Moore"), located at 400 South Eastern Ave, Moore, OK 73160, was bruglarized. This ATM was approximately a 27-mile drive from FFCU. This time, three of the five members from the FFCU crew can be seen interacting with the ATM, using the same method as before – prying the ATM open with pry bars, and setting tow hooks in the face of the ATM before using the Sierra to make the cash cassettes available. Ultimately, the crew departed the area of FFB – Moore, after stealing $99,415 in cash from the ATM. Upon departing the area, the crew proceeded to dump the stolen Sierra in a nearby residential neighborhood, footage of which was captured on multiple home security

surveillance cameras that were provided to law enforcement. Law enforcement recovered the Sierra and several five-dollar bills left inside.

## II.    The September 21, 2025 Larceny Attempt and Successful Larceny

12.    In September 2025, what appeared to be the same crew returned to Oklahoma City for an ATM larceny attempt at First Fidelity Bank, located at 1400 South Meridian Avenue, Oklahoma City, Oklahoma ("FFB Meridian"). This attempted ATM larceny happened on September 21, 2025, at approximately 2:31 a.m. On this occasion, suspects stole a white Chevrolet Silverado ("white Silverado") from the parking lot of the Pure OKC Apartments located at 3300 South Mustang Road, Mustang, Oklahoma[2]. Investigators obtained surveillance footage from the Pure OKC Apartments, which shows a white Nissan Altima ("Altima") arrive in the parking lot on September 20, 2025, at 4:15 a.m., where two individuals exit the car[3]. After several minutes, the Altima departed the apartment complex with the White Silverado following.

13.    According to FFB Meridian's surveillance footage, at approximately 2:31 a.m. on September 21, 2025, two masked individuals approached the ATM and began

---

[2]    The White Silverado bears Oklahoma license plate LYA486. The White Silverado is registered to an individual that law enforcement does not believe is involved in the criminal activity being investigated herein. The driver of the White Silverado reported it stolen to the Mustang Police Department.

[3]    The Altima was rented by Brandajah Senegal (SENEGAL) through Turo, Inc. Turo is a rental car platform that allows the owner of a vehicle to rent their vehicle to registered users of Turo. Turo refers to the vehicle owners as "hosts." The rental details were provided to law enforcement pursuant to the service of a Grand Jury Subpoena served to Turo, Inc. The vehicle host installed and maintains a GPS tracker on the Altima, and voluntarily provided the data to law enforcement.

prying it open while the white Silverado backed up to the face of the ATM[4].   The two individuals broke open the front of the ATM and then attempted to attach chains and two hooks from the White Silverado to the ATM.   However, the individuals could not successfully attach the hooks to the ATM.   The individuals then placed the hooks into the bed of the White Silverado and left the area in the truck at approximately 2:32 a.m.  The Altima's tracker data shows that at approximately 2:32 a.m., the Altima was at the intersection of South Meridian Avenue and Will Rogers Parkway, the intersection where FFB Meridian is located.

14.    Shortly after the FFB Meridian ATM larceny attempt on September 21, 2025, the white Silverado was used in an ATM larceny at First Fidelity Bank located at 1521 North Mustang Road in Mustang, Oklahoma ("FFB Mustang").   This bank is an approximate 10 mile drive from FFB Meridian depending on the route taken. FFB Mustang surveillance footage shows that the white Silverado arrived at the bank at approximately 3:00 a.m.  Two individuals broke open an ATM with pry bars while a third individual backed the White Silverado up to the face of the ATM[5].   The two individuals connected hooks and chains from the white Silverado to the ATM.   The white Silverado then

---

[4]    The two individuals at the FFB Meridian ATM robbery attempt wore near-identical clothing.  However, one of them was clearly observed wearing a pair of gray tennis shoes, while the other wore blue sweatpants with a white pair of tennis shoes.

[5]    Surveillance footage provided by FFB Mustang depicts the two individuals wearing similar clothing to the two individuals involved in the FFB Meridan robbery attempt: one wearing black clothing with gray tennis shoes, and the other wearing blue sweatpants with white tennis shoes.

accelerated multiple times, attempting to break open the ATM.  After several attempts, the ATM was dismantled, and the white Silverado pulled the ATM out of camera view.  The group ultimately stole $24,220 in cash from the ATM.  The white Silverado left the bank surveillance view at approximately 3:03 a.m. and was recovered by the Mustang Police Department from the parking lot of FFB Mustang.

### III.    The October 17, 2025 Larceny

15.    On October 17, 2025, an ATM larceny occurred at FirstBank located at 731 South Mississippi Avenue, Atoka, Oklahoma ("FirstBank Atoka").  Surveillance footage from FirstBank Atoka shows a black Chevrolet Silverado, bearing Oklahoma license plate RFY305 (the "black Silverado"), back up to the face of the ATM at approximately 5:34 a.m.[6]  The black Silverado was later reported stolen.

16.    At approximately 5:35 a.m., two individuals exited the black Silverado.  Both individuals wore black clothing, gloves, and masks. The individuals approached the ATM with pry bars while another individual backed the black Silverado, with a set of chains draped over its tailgate, up to the face of the ATM.  After approximately forty seconds, the two individuals opened the hatch of the ATM and used the pry bars to create an opening for the chains and hooks.  At approximately 5:36 a.m., once the chains were connected from the truck to the ATM, the black Silverado accelerated, breaking the doors off the ATM.  The two individuals near the ATM met with the black Silverado's driver and

---

[6]    The black Silverado is registered to an individual that law enforcement does not believe is involved in the criminal activity being investigated herein.

retrieved cassettes from the ATM.  All three individuals then returned to the Black Silverado and left FirstBank at approximately 5:36 a.m.

17.    Law enforcement later obtained surveillance footage showing the theft of the black Silverado from a residence located in Atoka, Oklahoma.  The surveillance footage shows that the black Silverado was stolen on October 17, 2025, at approximately 5:18 a.m. Due to the angle of the surveillance camera, the individual(s) involved in stealing the black Silverado were not observed.

18.    Additional surveillance footage was obtained from another residence located in Atoka, Oklahoma.  This footage depicts a dark-colored Chevrolet pickup truck appearing to stage just few blocks north of FirstBank along with a mid-sized SUV.  Based on my training and experience, it is apparent that the mid-sized SUV was the partner vehicle to the black Silverado because the mid-sized SUV was patrolling the area during the FirstBank Atoka larceny[7].

19.    Law enforcement later recovered the black Silverado, cassettes from the ATM, and a pry bar near 210 West 5th Street, Atoka, Oklahoma, approximately 0.3 miles from FirstBank Atoka.  The group stole approximately $32,500 in cash from the ATM.

### IV.    Identification of Joseph

20.    Law enforcement identified Luke Joseph (JOSEPH) as a likely participant in the FirstBank Atoka burglary / larceny based on a combination of cellular analysis resulting

---

[7]    Surveillance footage gathered from FirstBank Atoka and surrounding businesses and residences did not provide a clear image of the partner vehicle, leaving its make and model unknown to law enforcement.

from court-authorized pen registers, trap and traces, GPS ping collections, and "cell tower dumps"[8] on his cellular phone, who at the time, used phone number 337-600-3566 ("Account x3566") serviced by AT&T. The order was signed by a District Judge in the District Court of Oklahoma County, Oklahoma.

21.    In November 2025, the FBI identified and served a Grand Jury Subpoena to JP Morgan Chase Bank (JPMC), seeking statements and account ownership information for any accounts associated with JOSEPH. During a review of the production provided by JPMC for JOSEPH's account, law enforcement determined JOSEPH was sending and receiving money using Zelle. On December 8, 2025, the FBI served a Grand Jury Subpoena to Early Warning Services, LLC, which is the parent company of Zelle. Zelle is a peer-to-peer payment platform that allows users to link their bank account in order to send and receive money with other registered users of Zelle. Zelle provided investigators with several documents that detail transactions that JOSEPH and others have been party to. After additional review of the Zelle transactions, law enforcement observed a transaction to an online retailer, CarAndTruckRemotes.Com, which specializes in replacement aftermarket vehicle remotes. This website was of particular interest to law enforcement due to the members of the crew utilizing stolen vehicles for the execution of the ATM larcenies.

---

[8]    A tower dump is an investigative technique used to identify phone numbers captured by specific cellular towers. The tower dump order is served to all major cellular service providers. The providers then provide law enforcement with a list of phone numbers captured by their nearest tower to the location of interest within the specified timeframe. From there, investigators can compare the two locations, identifying common numbers between them, which would then place the respective devices in the area of that tower during the time period requested in the court order.

10

Based on my training and experience, I know criminals to use a variety of vehicle theft methods – including purchasing vehicle keys online and reprogramming them for the purpose of stealing vehicles. Law enforcement believes this may be the case with the stolen vehicles in this investigation – especially considering how quickly the vehicles were stolen. Information requested from CarAndTruckRemotes.Com regarding the purchases by JOSEPH revealed he purchased a *Dodge Challenger Hellcat Remote Key Fob* and, a co-conspirator, purchased three additional key fobs for different vehicles. JOSEPH provided the email LUKELADAY@ICLOUD.COM (the SUBJECT ACCOUNT) at the time of the key fob purchase.

22.     The bank that JOSEPH used for Zelle was Pelican Credit Union ("PCU"). From there, the FBI served another Grand Jury Subpoena to PCU seeking statements and account ownership information for accounts associated with JOSEPH. On November 28, 2025, PCU produced a series of documents, which included account ownership information. In JOSEPH's account-opening documents, the SUBJECT ACCOUNT is the listed email for contact information, which also identified JOSEPH as the account owner.

23.     During a review of PCU transactions following the burglaries, JOSEPH made several large cash deposits to his account immediately following successful larcenies of ATM's. For example, following the larceny on August 22, 2025, at FFB Moore where over $99,000 was stolen, JOSEPH made several cash deposits, over the course of a week, to his PCU account for a total in excess of $10,000. Following the larceny on September 21, 2025, at FFB Mustang where over $24,000 was stolen, JOSEPH deposited cash in

excess of $16,000 to his account. Lastly, following the larceny on October 17, 2025, at the FirstBank Atoka where over $32,000 was stolen, JOSEPH deposited cash in excess of $7,000 to his account.

24.     On May 5, 2026, the FBI took enforcement action to execute two federal residential search warrants and three federal arrest warrants in Opelousas, Louisiana and Lafayette, Louisiana. In addition to the operation executed, investigators requested and obtained an iPhone 15 Plus belonging to JOSEPH, which was in the custody of his mother, Zebada Laday.

25.     In June 2026, a federal search warrant for the iPhone 15 Plus belonging to JOSEPH was sought and obtained in the Western District of Oklahoma. As a result of the extraction of the device, SUBJECT ACCOUNT was determined to be linked to JOSEPH's iPhone 15 Plus, in addition to an iCloud account appearing to belong to JOSEPH's co-conspirator, Tijhae Byers. Due to the nature of iPhones, only a partial extraction of the device was achieved.

26.     Based on the aforementioned details, it appears JOSEPH utilizes the SUBJECT ACCOUNT as his primary email address for his online and phone activity.

## BACKGROUND CONCERNING APPLE

27.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

12

28.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.     iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.

13

iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.      Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users.  It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.      App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

29.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  The

account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

30.     Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

15

31.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

32.     Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer

16

service, including communications regarding a particular Apple device or service, and the repair history for a device.

33.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple.  Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

34.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude

17

the innocent from further suspicion.   For instance, I know that individuals involved in conspiracies to commit bank robbery nearly always use cellphones to coordinate their plan and surveillance of target locations with co-conspirators.  I also know, based on cell phone records, that JOSEPH travels with an iPhone associated with the SUBJECT ACCOUNT and therefore, the evidence of the aforementioned criminal activity is likely to be located within the contents of the SUBJECT ACCOUNT.

35.    For example, the stored communications and files connected to an Apple ID is likely to provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

36.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.   Such

18

information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation. This is, of course, highly relevant here, as **JOSEPH** travels frequently and across state borders to carry out ATM burglaries. The "user attribution" evidence sought herein will help investigators, among other things, identify the location of the device during the criminal events and the device owner.

37.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). Such information is highly probative, particularly when the target is conscious of law enforcement surveillance—which I believe **JOSEPH** is, based on several attempts to thwart law enforcement efforts to identify those involved.

38.    Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. A review of banking applications downloaded by **JOSEPH**, for instance, could establish additional banking institutions he is using to deposit the illicit proceeds in addition to his JPMC account and Zelle account discussed herein. In addition, emails, instant messages, Internet activity, documents, and

19

contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

39.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **CONCLUSION**

40.     Based on the forgoing, I request that the Court issue the proposed search warrant.

41.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Apple.  Because the warrant will be served

on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Sam Spencer
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 26th day of June, 2026.

CHRIS M. STEPHENS
United States Magistrate Judge

21

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Apple ID LUKELADAY@ICLOUD.COM ("the SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

## Particular Things to be Seized

**I.      Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and

accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

c.      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

d.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

e.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and capability query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Find My and AirTag logs, logs associated with web-

based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

f.        All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with AirTags, Location Services, Find My, and Apple Maps;

g.        All records pertaining to the types of service used;

h.        All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

i.        All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.    Information to be seized by the government**

The information described above in Section I to be seized from the **SUBJECT ACCOUNT**, as described in **Attachment A**, would be any evidence and instrumentalities of violations of 18 U.S.C. §§ 2113(b) (Bank Larceny) and 371 (Conspiracy to Commit Bank Larceny) (collectively, the **TARGET OFFENSES**)—specifically, evidence of the theft and attempted theft of monies from ATMs and a conspiracy to do the same—which law enforcement believes exists in the **SUBJECT ACCOUNT**, namely:

a.    All records or other information regarding the identification of the **SUBJECT ACCOUNT**, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.    Evidence of the **TARGET OFFENSES** created between August 1, 2025, through October 31, 2025, namely:

i.    Communications—including e-mails, text messages, instant messages, chat logs, call logs, voice notes, voice mails, attachments to messages, images, and drafts of such communications—related to the **TARGET OFFENSES**;

ii.     Geographic data associated with the above-listed communications and images, including GPS data and metadata associated with files and attachments;

iii.    Notes, voice-notes, pdfs, files, and other internal files maintained that relate to possession, acquisition, storage, and/or distribution of proceeds from the **TARGET OFFENSES**;

iv.     Location data, including GPS data and map application caches, showing the location of the **SUBJECT ACCOUNT**;

v.      Images, photos, videos, along with accompanying metadata regarding the location timing and generation of those files, depicting proceeds, bank larceny conspirators, and other evidence of the **TARGET OFFENSES**;

vi.     Records of financial transactions, including wire transfers, bank deposits and withdrawals, credit or debit card activities, cold storage wallets, seed lists, cryptocurrency transactions, money transfer applications, and electronic currency activities;

vii.    Application records, such as banking applications and rental car service applications, related to the facilitation of the **TARGET OFFENSES**;

viii.   Social media posts, messages, entries, or communications related to the **TARGET OFFENSES**, including social media posts, messages, entries, or communications showing or discussing the proceeds of the **TARGET OFFENSES**;

ix. Contact lists showing names, street names, nicknames, phone numbers, email addresses, or screen names of individuals associated with the **TARGET OFFENSES**;

x. Evidence of deleting, encrypting, or concealing any of the identified categories above;

xi. Evidence indicating how and when the **SUBJECT ACCOUNT** and associated cell service were used, including user attribution evidence, to determine the identity of the user(s) of the **SUBJECT ACCOUNT**, the chronological context of its use, account access, and events relating to the crimes under investigation;

xii. Records evidencing the use of the **SUBJECT ACCOUNT** to access the internet, namely:

    1. Internet Protocol addresses used;

    2. Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses related to bank, credit union, ATM, rental of vehicle(s), maps, navigation, tow bar, chain, prybar, key fobs, and General Motors trucks.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities within the scope as described in this warrant. The review of

this electronic data may be conducted by government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, technical experts.